NBF3GIRM

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    UNITED STATES OF AMERICA,

4              v.                            22 Cr. 6 (KPF)

5    PIERRE GIRGIS,

6                   Defendant.

7    ------------------------------x    Motion

8                                          New York, N.Y.
                                          November 15, 2023
9                                          10:00 a.m.

10

11   Before:

12                   HON. KATHERINE POLK FAILLA,

13                                          District Judge

14                         APPEARANCES

15   DAMIAN WILLIAMS
          United States Attorney for the
16        Southern District of New York
     SARAH L. KUSHNER
17   KYLE A. WIRSHBA
          Assistant United States Attorney
18             -and-
     SCOTT CLAFFEE
19   National Security Division's Counterintelligence and Export
     Control Section
20
     FEDERAL DEFENDERS OF NEW YORK
21        Attorneys for Defendant
     ANDREW J. DALACK
22   MICHAEL ARTHUS
     HANNAH McCREA
23

24

25

NBF3GIRM

```
 1              (Case called)

 2              MS. KUSHNER:  Good morning, your Honor.  Sarah

 3    Kushner, Kyle Wirshba for the government, and also at counsel

 4    it's table is Scott Claffee from the National Security

 5    Division.

 6              THE COURT:  Mr. Dalack?

 7              MR. DALACK:  Good morning, Judge.  Andrew Dalack,

 8    Michael Arthus, and Hannah McCrea from the Federal Defenders.

 9              With apologies, I flagged to the Court this morning

10    that we intend to waive Mr. Girgis's presence today, and I

11    apologize for not giving the Court more advance notice.

12              THE COURT:  That's fine.  He was welcome.  He's also

13    welcome to waive, and we'll let him do that.  But I think that

14    it is an interesting issue that raises for me and an

15    interesting logistical issue which is, in theory, there is a

16    component of this oral argument that is classified.  And, in

17    theory, there is a component that is not classified.  I'm not

18    going to move us to the classified portion preemptively because

19    there are courtroom access rights that have to be vindicated as

20    well.

21              What I'm -- I won't say struggling with, but what I've

22    been thinking about is exactly how much classified information

23    has to be disclosed in this proceeding as a whole?  For

24    example, it seems to me that you've made arguments, and your

25    arguments are made in documents that are publicly documented
```

NBF3GIRM

1    and can be addressed in a public manner.  And to the extent

2    that I'm talking about FISA or Circuit and District Court

3    decisions addressing FISA, I think I can talk about them here.

4    It seems to me that only if I were getting into the minutia of

5    the FISA applications at issue here would I be heading off into

6    classified territory.

7             That's a very long way of saying where, if at all, do

8    you think we need to stop speaking in this courtroom and move

9    to the classified courtroom?

10            MR. DALACK:  I'm certainly happy to let the government

11   take that up.  From our perspective, we're not in possession of

12   any classified material in connection with this case.  So, I

13   suspect to the extent we get into any of the minutia or details

14   with respect to the FISA applications themselves and their

15   content, that might be an appropriate time to relocate.

16   Obviously we would want to be able to participate in that.  I

17   think the government might have a contrary position to our

18   participation in that setting.  But it certainly would go to

19   the spirit of our motion to compel.

20            THE COURT:  May I ask the question a different way,

21   please.  Which is do you believe that I can address the issues

22   raised by your motion without adjourning to the classified

23   courtroom?

24            MR. DALACK:  I think you can, your Honor, yes.  I

25   think though, because we're not privy to any of the substance

NBF3GIRM

1    of the applications, we've asked the Court to, in its sort of

2    supervisory powers and pursuant to the Fifth and Sixth

3    Amendments, allow us an opportunity to potentially receive

4    summaries or substitutions concerning some of the content of

5    the FISA applications.

6            The reasons why we think we are entitled to those

7    certainly doesn't affect any classified information.  It might

8    implicate some information that was disclosed to us pursuant to

9    the protective order in this case, but doesn't concern any

10   classified information.

11           So, yes, I think we can have a full argument on the

12   merits of our motion to compel without having to relocate.

13           THE COURT:  Thank you, sir.

14           Ms. Kushner, am I addressing questions to you or to

15   Mr. Wirshba or to Mr. Claffee this morning?

16           MS. KUSHNER:  To me, your Honor.

17           THE COURT:  Thank you so much.  What is your position,

18   please?

19           MS. KUSHNER:  Your Honor, the government's position is

20   that anything that is in the publicly filed briefs would be

21   completely appropriate for the parties and the Court to discuss

22   that in open court.  And anything that was redacted and only

23   contained in the classified brief would have to be addressed in

24   an ex parte Section 2 setting.

25           THE COURT:  To that end, if we get to that point, and

NBF3GIRM

1    I might need signals from folks at the front table to tell me

2    we're getting near that point, are you contemplating that's a

3    proceeding I'm having with just the folks at the front table?

4             MS. KUSHNER:  That's correct, your Honor.

5             THE COURT:  Okay.  I understand what you are saying.

6    Do you believe, same question I asked Mr. Dalack, that I need

7    to -- well, I'll ask the question from the opposite

8    perspective.

9             Do you believe I can address fully the defense's

10    arguments for disclosure of additional information without

11    getting into classified materials?

12             MS. KUSHNER:  Yes, your Honor, to the extent that the

13    Court feels comfortable that it could determine or that it

14    could relay in this courtroom that it would be able to review

15    the legality of any FISA materials in an ex parte proceeding.

16             THE COURT:  Okay.  Let me do this.  Let me --

17    Mr. Wirshba, what is she missing?

18             MR. WIRSHBA:  Your Honor, I was just conveying with my

19    colleague that the Court of course has the benefit of the

20    government's written motions and a substantial amount of

21    classified discovery that's been submitted to the Court.  So

22    unless the Court has any questions about that specifically, I

23    think the Court would be able to address any questions that do

24    not relate to those materials in an open setting, and then make

25    a decision based on the written materials it has that are

NBF3GIRM

1  classified and any discussion it requires with respect to the

2  unclassified materials which have been submitted to it.

3          THE COURT:  Thank you.  And to that end, let me note

4  that I have reviewed all of the materials that are on the

5  public docket.  I have also been given a rather lengthy

6  submission, classified submission from the government.  I have

7  reviewed it in its entirety.  I've reviewed the brief and I've

8  reviewed all of the exhibits that go along with it.  There is a

9  lot.  And so, I do think, I will do my best, and I believe I

10  can separate what I know from the publicly filed information

11  from what I learned from that.  But, I will proceed.

12          Mr. Dalack, this is your motion, so am I directing

13  questions to you or to someone else at your table?

14          MR. DALACK:  With the Court's permission, I think

15  Mr. Arthus will handle the laboring oar on that.

16          THE COURT:  Welcome and thank you.

17          MR. ARTHUS:  So I won't belabor everything in the

18  motions because obviously it was pretty heavily briefed.

19          With regard to the FISA materials, though, there is

20  one thing I really want to emphasize and stress in terms of the

21  necessity of us participating in that litigation and our input.

22          This is a unique FISA-related case.  This isn't a

23  situation where we're hypothesizing about a *Franks* issue or

24  making some sort of supposition.  There is a clear-cut *Franks*

25  issue from the discovery that we have received that exists,

NBF3GIRM

1    that is going to be subject to litigation, and that is likely

2    going to be successful.  The Court is I'm sure aware of what

3    the *Franks* issue is.

4            THE COURT:  I am aware.  I'm not joining you with the

5    likely to be successful point yet.  I've read several thousand

6    pages more material than you have.  I'm not sure you are going

7    to make the materiality or the absence of probable cause.  But

8    that's for another proceeding.

9            MR. ARTHUS:  That's the subject we really want the

10   opportunity to litigate, and it is really necessary for us to

11   litigate, and we are not capable of litigating without the

12   actual underlying FISA materials.  It is practically impossible

13   for us to challenge and make out the materiality standard

14   without actually seeing the warrant and affidavits that we're

15   trying to challenge.  We know there are material

16   misrepresentations and omissions, or at least there are

17   misrepresentations and omissions, namely --

18           THE COURT:  There are two.  May I call them for short

19   Flanagan and McGonigal?

20           MR. ARTHUS:  Sure, yes, yes.

21           THE COURT:  I appreciate that there are more words

22   than that, but I believe I understand those to be the

23   categories of misrepresentations you've identified.

24           MR. ARTHUS:  There are at least two.  The government

25   seems to be contesting our position that there was an e-mail

NBF3GIRM

1    that was sent between the government.

2              THE COURT:  The Connors e-mail, sir.  That, suffice it

3    to say, that's not an additional category of misrepresentation.

4              MR. ARTHUS:  I'll take that.

5              So those are the two categories of misrepresentations

6    and omissions.  We would point to Flanagan's background and the

7    McGonigal situation, and we need the chance to be able to

8    litigate those.  In order to do that, we have to be able to see

9    the entire warrant materials to explain why this

10   misrepresentation and omission was material.  And it involves

11   placing what is in the FISA materials in the context of

12   everything that's been going on in this case, which is over

13   200,000 pages of discovery that we've seen, electronic

14   communications, hundreds of hours of recorded calls in Egyptian

15   Arabic.  This is precisely the type of situation where

16   adversary litigation will be necessary here to place all that

17   in context.

18             THE COURT:  Sir, actually, I have broader questions,

19   but I am going to meet you in these granular questions with the

20   arguments you are raising.  And please understand -- your

21   colleagues will tell you -- sometimes I ask questions to kick

22   the tires, and I wouldn't be doing my job if I weren't being

23   probative or really challenging all of your arguments.  So

24   don't read too much into this.

25             But, given the materials that you have seen, and some

1  of which are actually summarized in, for example, the

2  indictment in this case or summarized in the government's press

3  release about the indictment or in publicly filed information,

4  why does -- Mr. Flanagan seems to be a hair on the tail of the

5  dog. I'm not sure you're suggesting, or maybe you are, that if

6  you were to look at the totality of the materials, you'd

7  realize his criticality to the whole case. But there is a

8  whole lot of stuff that would seem to me that doesn't any in

9  way he implicate Mr. Flanagan.

10         So why do I care?

11         MR. ARTHUS: What we've seen in the Rule 41 warrant is

12  that Flanagan is the central figure in that Rule 41 warrant. I

13  was reviewing it again last night, and there seems to be only

14  one aspect of that warrant that doesn't at least cite to him or

15  reference him or is based on information that was provided, and

16  that was the FBI interview. Other than that, 95 percent of the

17  factual allegations in that warrant relate to what they call

18  Retired Captain-1. He's cited in all those paragraphs. He's

19  the source of all of the information.

20         So, if he is likewise the critical source of

21  information in the FISA warrant, then he is the critical source

22  of probable cause, and that's what we would need to challenge,

23  but we haven't seen it, is the issue.

24         THE COURT: Of course. Now let's go into the broader

25  point. You've just hit the nail on the head. Is he the

NBF3GIRM

```
1    critical source for all of the other information?  I know, you

2    don't; government knows, and you don't, and I get it.  I

3    appreciate why you want to know this information.

4           The issue for me is that there seem to be a whole lot

5    of Circuit Court decisions across the country that allow, that

6    permit the ex parte review process that is contained in FISA.

7    And indeed, I know the Seventh Circuit in the *Daoud* case, in

8    particular, Judge Rovner's concurrence makes a point of saying,

9    a recognition that FISA makes *Franks* applications difficult, or

10   *Franks* challenges difficult.  Because it is hard to know what

11   was in the underlying FISA warrant, and I get that and I

12   appreciate what you are saying to me, which is this is the

13   unicorn case where you actually know that there is a mistake.

14          But, stepping back a moment, I understood the point of

15   FISA, the procedures of FISA to be that I got to do the review.

16   I'm given everything.  I'm also given your arguments, both your

17   public arguments and then any Section 2 arguments you want to

18   make.  And I'm allowed to look and see whether in fact

19   Mr. Flanagan was critical or not.  Whether he even shows up at

20   all.

21          And so I'm not sure why, given that the courts

22   recognize and have allowed and recognized the constitutionality

23   of this ex parte proceeding, I'm not sure why this case is so

24   different that I can't do what I do in any other FISA case.

25          MR. ARTHUS:  So I think the answer to that would be
```

NBF3GIRM

1    two-fold.  FISA certainly contemplates ex parte review of the

2    materials, but it does contain, both through the case law,

3    through the constitutionality of it, exceptions for where our

4    input is necessary to accurately determine the legality.

5        We don't have any question about the Court's ability

6    to read a warrant application and read that ex parte.  That is

7    certainly legal.  Our position is based on the scope of the

8    discovery that we've seen, the truly complicated, complex stuff

9    that we've received, thousands and thousands and thousands of

10   pages of electronic disclosure, hundreds of calls in Egyptian

11   Arabic, we don't expect the Court to have the time to actually

12   be able to sit down and review those in conjunction with

13   reviewing the search warrants.  It's taken us months and months

14   and months and months to even start to be able to work through

15   this.  And we believe that the entire scope of the case would

16   necessitate that.  Not to mention the case law has also been

17   pretty explicit in saying that *Franks* situations are precisely

18   the types of situations where disclosure would be appropriate

19   under FISA.

20       THE COURT:  Okay.  So let's back up, please.

21       To the extent you are relying on Section 1806(f) or

22   Section 1825(g), I'm understanding that I am permitted to

23   disclose those materials to you only where it's necessary to

24   make an accurate determination of the legality of the

25   electronic surveillance or the physical search.

NBF3GIRM

```
 1          So to the extent that I myself have thousands of pages
 2   of materials to review, and I can do that and I don't need your
 3   help, why do I nonetheless have to disclose this to you?  I
 4   appreciate if I can't understand it, then yes, of course.  But
 5   what if I can?
 6          MR. ARTHUS:  There is also a due process aspect of it
 7   too that is implicated here.
 8          THE COURT:  Courts have allowed the ex parte review in
 9   the face of due process concerns, including the Second Circuit.
10          MR. ARTHUS:  Yes, they've certainly permitted it in
11   circumstances, but there is a built-in mechanism within FISA
12   that says that disclosure is required if necessary to comport
13   with due process.
14          THE COURT:  Sure.  That's 1825(h).
15          MR. ARTHUS:  Yes.  And here I think this is a
16   situation where disclosure is necessary for due process.  We
17   have Brian Connors who is the affiant, or at least likely the
18   affiant for these warrants.  When you look at the Rule 41
19   warrant, it's very troubling with what he included, with what
20   he left out.  And if there is a similar circumstance where --
21          THE COURT:  What's so troubling about the Rule 41
22   warrant?
23          MR. ARTHUS:  The fact that when he is citing to his
24   primary source in that Rule 41 warrant is Flanagan.  And he,
25   through the discovery materials that the government has
```

1    provided us, Connors at least had a supposition, an inkling,

2    and likely knew that Flanagan had a criminal record at the time

3    he was tasking him as a source.

4         THE COURT:  First of all, not convinced he is a

5    source, at least not in the formal sense.  Two, what makes you

6    believe that Connors either knowingly, intentionally omitted

7    this information or did so with reckless disregard?

8         MR. ARTHUS:  I think that's what he said to the

9    government when the government subsequently interviewed him, is

10   he had been alerted by the NYPD authorities that Flanagan was

11   someone who would likely not talk to law enforcement, which he

12   interpreted as having something to do with a criminal record or

13   prior criminal contacts.  Yet he conducted no background check

14   whatsoever.  Something as simple as the government was very

15   easily able to figure out, just by running a rap sheet,

16   conducted no background check of this man whatsoever.  There

17   were red flags early on that he had a criminal record, and

18   Connors did nothing to look into that, let alone include it in

19   his warrant application.  And then I think actually told the

20   government later on that he didn't know that inclusion of

21   someone's criminal record was really even a necessary part of a

22   warrant application, which seems --

23        THE COURT:  I'm not sure I understood that.  I thought

24   there was something about running criminal records for folks

25   who were sources, as distinguished from anyone who comes in and

NBF3GIRM

1     speaks to the FBI.

2          MR. ARTHUS:  Yes.

3          THE COURT:  But yet again, I also don't quite

4     understand the materiality of this.  And we're wandering a

5     little far afield from the overarching issues you want to

6     raise.  You are here with the 41 warrant, so we'll talk about

7     it.

8          It's not at all clear to me that Flanagan is the

9     principal source, but fine, that's your argument.  Even if he

10    is, there is an awful lot of stuff that's been produced to you

11    that does not have Flanagan's fingerprints anywhere on it.

12         MR. ARTHUS:  Yes, in the discovery, yes.

13         THE COURT:  In the discovery, yes.

14         MR. ARTHUS:  Yes, I'm focusing on -- that would be the

15    focus in the *Franks* context, would be on the actual face of the

16    warrant application itself, and that is heavily reliant on

17    Flanagan.  It is almost every single paragraph references him

18    short of the FBI interview.

19         So, in terms of the actual trial itself, the trial

20    that would happen, there may be a discussion about how

21    important of a witness Flanagan is.  But in terms of the

22    warrant applications, he was all over at least the Rule 41

23    warrant, in every single paragraph is referencing him, short of

24    the one FBI interview that took place, which our position is --

25    and not having fully briefed it -- but our position is that

NBF3GIRM

1    that one FBI interview wouldn't be sufficient to establish

2    probable cause.  They need Flanagan to get probable cause, and

3    that's talking about the Rule 41 warrant in the FISA context.

4    Not to mention Connors' involvement, because Connors is the --

5    Connors is what this *Franks* hearing is about.  The *Franks*

6    hearing is not about Flanagan's credibility as much as

7    Connors', not including issues in the warrant applications

8    themselves.

9            THE COURT:  "Issues"?  One issue.  What's the issues

10   that he didn't include?

11           MR. ARTHUS:  A critical issue --

12           THE COURT:  It's a stupid thing that ends up being a

13   criminal act, a misdemeanor in Long Island.  It is profoundly

14   stupid.  I'll agree with you on that part.  But I'm not sure it

15   undoes probable cause, given everything else that you've seen

16   and that you've received.  Maybe in that Rule 41 warrant, okay.

17           Let me pivot though.  Imagine hypothetically that

18   Connors isn't the affiant on any of the FISA materials.

19   Imagine.  Imagine there's a whole lot of stuff that doesn't

20   involve him at all.  Why does your potentially successful

21   *Franks* application on the Rule 41 warrant have anything to do

22   with anything on the FISA warrants, particularly if I can

23   figure out and isolate there is no Connors' involvement and no

24   Flanagan involvement in certain aspects?

25           MR. ARTHUS:  Sure.  I know that the Court appreciates

NBF3GIRM

1    that we're kind of shadowboxing here because we don't know, we

2    are just guessing here.

3         THE COURT:  I am hypothesizing, so I'm not helping you

4    any.

5         MR. ARTHUS:  What we see in that e-mail exchange with

6    the government is there was some sort of misrepresentation and

7    omission.  If it wasn't Connors or Flanagan or anything related

8    to the Rule 41 warrant, then there is some other material

9    misrepresentation or omission out there that we need to

10   investigate and litigate about.  But we don't know what's in

11   there.

12        All we know is there was a misrepresentation and

13   omission, the government investigated it, the government made

14   this determination they didn't consider it to be material, and

15   in that situation, that's the precise thing that we're seeking

16   to litigate, is whether it was material or not.

17        THE COURT:  Let's go back to due process and the ex

18   parte proceedings.  In your research, have you found a

19   situation where a federal court has found that FISA's ex parte

20   procedures are violative of someone's constitutional rights?

21        MR. ARTHUS:  No.

22        THE COURT:  The one District Court case that did then

23   got overturned by the Seventh Circuit.

24        MR. ARTHUS:  Yes.  There is nothing we can point to as

25   this is a case that has said this is unconstitutional or that

NBF3GIRM

1    it violates due process.

2           THE COURT:  Have you seen a case in which a disclosure

3    has been made pursuant to 1825(h), and in particular the due

4    process portion of it, have you actually seen a court rely on

5    that as a basis for disclosure?

6           MR. ARTHUS:  No, I don't believe so.  I also don't

7    believe we've seen a case that closely mirrors what's actually

8    happening here, which is that we have a clear-cut *Franks* issue

9    that exists in a case.  Much of the decisions that we've seen

10   are opinions where the Court is saying that the defense is

11   hypothesizing about a potential *Franks* issue.  Just kind of

12   citing *Franks* as a backdoor to get into the FISA materials.  I

13   don't think we've seen a case so far that points to the

14   existence of a *Franks* issue, and yet disclosure was not

15   ordered.

16          I think it's rare to actually see a case in this

17   context where there is a clear *Franks* issue that we are

18   absolutely entitled to litigate, and that we simply can't

19   because we don't have the materials, and so we can't

20   meaningfully do anything but submit a boilerplate motion at

21   this point saying there is a *Franks* issue in the FISA context.

22          THE COURT:  Fair.

23          One of the things that doesn't help your argument is

24   the fact -- if you just focused on *Franks* and if you just said

25   we have a clear *Franks* issue in the Rule 41 warrant and we

NBF3GIRM

1    imagine, we just imagine –– in an educated way, you are not

2    guessing, but you are thinking, knowing how investigations

3    work, it would not shock us to learn that the affiant on the

4    Rule 41 warrant also had a significant involvement in the FISA

5    applications, and for this reason we believe we are entitled to

6    it.  I understand that argument.  That's fine.  That's a nicely

7    cabined in argument.

8         But then, where you lose me is where you start to say

9    now we need to consider whether the certifications were

10   properly made.  Now we need to consider whether there was

11   proper minimization.  You have no basis for contesting the

12   certifications that were made.  Do you?

13        MR. ARTHUS:  I think it is certainly in the

14   minimization context, we certainly do have a basis, which is

15   certainly we've seen a lot of discovery in this case.  And what

16   we've seen is that this was surveillance that was going on for

17   years encapsulating, as we said, hundreds of thousands of

18   electronic communications, and hundreds of hours of these

19   recorded calls.  That in itself gives rise to the likelihood

20   that there wasn't sufficient minimization, because this dragnet

21   is capturing basically every conversation that Mr. Girgis had

22   with other individuals.

23        It doesn't seem, based on what we've seen in the

24   discovery, that this was cabined or targeted in any way to

25   limit the acquisition of non-national security related

NBF3GIRM

1    information.  We can't say more than that, because we don't

2    have access to any of the certifications underlying, but what

3    we've seen in the discovery gives rise to, at the very least,

4    serious minimization concerns.

5        THE COURT:  Simply by dint number of materials you've

6    received.

7        MR. ARTHUS:  And the content.  The fact it sweeps so

8    broadly.  It seems to be capturing a lot of stuff that, when

9    we're reading it, we're scrolling through it because it has

10   nothing to do with anything related to foreign agents or

11   foreign registration or anything in that context.  We're

12   reading a bunch of personal communications he's having with

13   individuals that would seem to sweep well beyond any kind of

14   reasonable minimization procedure.

15       THE COURT:  Answer the first part of my question

16   though.  What challenges do you have to certification?  It is

17   not for me to second guess the certifications.  I've seen the

18   certifications, they exist.  I understood that I am to presume

19   them to be valid.

20       What's the basis for me to do away with that

21   presumption?  And more importantly, what is the basis for me to

22   let you see these materials on a certification challenge?

23       MR. ARTHUS:  I think it would be because what we've

24   seen with the way that this was handled, with the way that this

25   investigation was handled, with the way that the search

NBF3GIRM

```
1    warrants are troublingly leaving out important information with
2    the way that they seem to sweep well beyond normal
3    minimization, there is serious concerns about the way that the
4    FISA process was utilized in this case.  And this isn't a case
5    where it seems like they checked off all the appropriate boxes
6    in every other context and we are saying just give us access to
7    the certifications.  It seems like there were a lot of problems
8    with the FISA process here.  So we would point to
9    certification.
10           THE COURT:  What are the problems?  I want to make
11   sure I understand the problems, because obviously you're
12   understanding the skepticism with which I'm viewing that answer
13   you've just given me.
14           MR. ARTHUS:  Yes.
15           THE COURT:  Because once again, are you disagreeing
16   with the law -- am I misstating the law?
17           MR. ARTHUS:  No.
18           THE COURT:  Which they're presumed valid, and it is
19   not my job to second guess them.  And you are asking me to
20   second guess them.  And what's your basis for thinking -- and
21   wait, you are going to say it is the errors, the McGonigal and
22   Flanagan errors, and in part because the government gave you a
23   lot of materials it had obtained through this process.
24           MR. ARTHUS:  Yes.
25           THE COURT:  Okay.  And what else?
```

NBF3GIRM

1          MR. ARTHUS:  That's what we have.  This is the issue

2    is we don't have the rest of it to challenge it.

3          THE COURT:  I understand and I appreciate your

4    backdoor efforts to get them that way.

5          My point is you might have a minimization argument.

6    Perhaps you have a probable cause argument.  But I don't see

7    how you have a certification argument, and that's why I'm

8    pushing you so hard on it.  I want to understand with clarity

9    what it is you are really fighting about here.

10         MR. ARTHUS:  Yes.  In terms of certification, and I'll

11   briefly touch on certification.  I think the Court can

12   understand the frustration that we have in terms of we are

13   being asked what are the issues with the certification, but we

14   haven't seen the certifications.  You're certainly correct that

15   it is the Court's authority to be able to review these

16   certifications in camera.  That's contemplated by FISA.  But

17   given the universe of problems that's happening here, we would

18   say that points to potential certification problems as well.

19         THE COURT:  Let me just say over and over again that's

20   the weakest argument you've made to me this morning, and

21   perhaps you don't want to focus on it.

22         MR. ARTHUS:  Sure.

23         THE COURT:  I'll leave it at that.  Thank you.

24         Was there something you wanted to add to your answer?

25         MR. ARTHUS:  No.

NBF3GIRM

1          THE COURT:  Good move.

2          Let me then understand, to the extent you haven't

3     already articulated it, the specifics of your constitutional

4     challenges.  It seems to me that what you are saying something

5     that in the face of all of these court decisions finding FISA

6     to be constitutional, both in the main and as applied, this

7     case is different because of the errors and because of the

8     productions that you've received.

9          MR. ARTHUS:  That's correct, yes.

10         THE COURT:  Now from there, tell me why there are

11    actual constitutional violations here.

12         MR. ARTHUS:  Yes.  So *Alderman* stresses the importance

13    of adversary litigation, particularly in circumstances

14    involving electronic surveillance, voluminous discovery,

15    potential *Franks* issues, *Alderman* points in those cases to the

16    importance of adversarial litigation as a component of due

17    process.

18         What we're simply trying to do here is put on a

19    defense for this man and litigate the suppression issues that

20    seem to us apparent, to at least be able to litigate them.

21         THE COURT:  You can litigate the Rule 41 one.  I'm

22    just not sure that whatever Rule 41 problems you have give you

23    entree to the FISA materials.  That's what I keep saying, and I

24    know you don't believe me.  That's where our problem is right

25    now.

NBF3GIRM

1      MR. ARTHUS:  We have no choice but to assume, from our

2  perspective, that the Rule 41 warrant and the FISA warrant are

3  similar.  That's the only choice we have, because we haven't

4  seen the FISA warrant, and the FISA application.  If the Rule

5  41 warrant and the FISA warrants are even closely related to

6  each other, if there is reference to Flanagan, the fact that

7  they're both apparently sworn out by Connors who was leaving

8  out critical information from the Rule 41 warrant, we have no

9  choice but to assume that there are problems with the FISA

10  application.  That means that we need to have an opportunity to

11  litigate that, to comport with the due process.

12      I think what's missing from the other cases

13  challenging the constitutionality of FISA, as the Court noted,

14  is the unique circumstances here, which are the problems that

15  are clearly apparent on the face of the record here from the

16  discovery we received.  And that's the main thing.  It is the

17  reliability of Connors that is the issue here.  And we know

18  that Connors is the affiant on the Rule 41 warrant, and

19  everything we've seen indicates that Connors is also the

20  affiant on the FISA applications, and therefore, with his

21  reliability in question, that is something we need to be able

22  to litigate, and *Alderman* points to us being able to litigate

23  that.

24      THE COURT:  Connors' reliability seems to me entirely

25  derivative of his invocation of Flanagan.  Is there some other

NBF3GIRM

1    area in which Connors has done something in your estimation

2    incorrect in the Rule 41 warrant or others?

3            MR. ARTHUS:  I think what we see from the discovery is

4    that Connors is someone who is -- I'm trying to think of the

5    nicest way to put this.  Someone who overlooks very important

6    information.  And when you look at just Flanagan --

7            THE COURT:  If you are going to malign him, tell me

8    how.  What is he overlooking?

9            MR. ARTHUS:  In the context of -- let's stick with

10   Flanagan for a second.  In the context of his relationship with

11   Flanagan, he is alerted very early on that there are problems

12   with Flanagan.  That Flanagan is someone who is not going to

13   speak to law enforcement, he interprets that as potentially a

14   problem with Flanagan's background.  Doesn't conduct any

15   background check.  Doesn't actually formally sign him up as a

16   source at any point.  Doesn't look --

17           THE COURT:  I'm not sure what's wrong about not

18   signing him up as a source.  You can fault him for not doing a

19   background check.

20           MR. ARTHUS:  These are things he discussed with the

21   government, so the government was asking questions about this,

22   so obviously the government was troubled by Connors not signing

23   him up.

24           THE COURT:  I don't understand that at all.  I need to

25   you connect those dots for me.  What did he do wrong in not

NBF3GIRM

1    signing up Flanagan as a source?  I would have thought it was

2    fine that he didn't sign him up, and his error -- if there is

3    an error -- is not running the criminal check on him,

4    concurrent with his discussions with him.

5        MR. ARTHUS:  It is the universe of what's going on

6    with Flanagan.  So not running a background check.

7        THE COURT:  That's not acceptable.  Thank you.  Let's

8    try that again.  You are telling me, you came out here and said

9    Connors overlooks important information.

10       MR. ARTHUS:  Yes.

11       THE COURT:  So fine.  I want to understand the

12   important information he's overlooked.  Then you say he was

13   aware of the Flanagan problems and didn't pursue them.  That

14   may be a problem, and I have that down, but now you are saying

15   and he didn't sign him up as a source.

16       What is problematic?  What is the important

17   information that he overlooked in not signing the man up as a

18   source?

19       MR. ARTHUS:  That wouldn't be overlooking information.

20   That would be sloppiness in his actually conducting this

21   investigation.

22       THE COURT:  Why?  He didn't have to sign him up as a

23   source.  Do you believe he had to?

24       MR. ARTHUS:  No.  Whether he formally had to is

25   different than whether or not he went out of his way not to,

NBF3GIRM

1    which would be our interpretation.

2              THE COURT:  Your argument is he avoided signing him up

3    as a source so it would allow him to live in this gray area

4    where he didn't check his criminal background?

5              MR. ARTHUS:  The not signing him up as a source is not

6    related to why he did or did not look into his criminal

7    background.

8              THE COURT:  No, but what is the overlooked important

9    information?  I am going to keep asking until you give me an

10   answer or leave this one as a basis.  But you are saying he

11   overlooked important information.

12             MR. ARTHUS:  Yes.

13             THE COURT:  What is the important information he

14   overlooked in not signing him up as a source?

15             MR. ARTHUS:  That's unrelated.  I'll move that off.

16             THE COURT:  Tell me --

17             MR. ARTHUS:  Stick with the criminal background.

18             THE COURT:  No, it was more than that.  You said he

19   overlooked important information.  What else, other than the

20   criminal history?

21             MR. ARTHUS:  That is the important information.  So

22   that's what we are relying on, is that the critically important

23   information that was not looked into.

24             THE COURT:  You have made Connors a much badder actor

25   by saying this is someone -- you were trying to be pretending

NBF3GIRM

```
1    to be nice about it saying I don't know how to say this, and
2    then you came to say he overlooked important information.  If
3    all you've got is the criminal history situation with Flanagan,
4    say that.  The way you built this up suggested to me there was
5    more out there that Connors did wrong than that.
6            MR. ARTHUS:  That's what we have, and that's he then
7    used that individual as the main source, in at the very least
8    the Rule 41 warrant, and made no effort to find out whether or
9    not this person was actually credible.
10           THE COURT:  Let's changed topics, please.
11           MR. ARTHUS:  Sure.
12           THE COURT:  I think the McGonigal indictment is an
13   indictment in both the technical and the colloquial sense of
14   this individual.  But, what's not helpful to me is when you say
15   things like "the government's response raises more questions
16   than answers."  That's interesting rhetoric that is completely
17   lost on me.
18           If indeed McGonigal had barely touched this file, what
19   more information do you need?  If the government has suggested
20   to you that he's only done certain things, and if they've
21   suggested to me, and I might ask them for greater granularity,
22   he's only done certain things, I don't know what other
23   information they have to give to you.
24           MR. ARTHUS:  It seems to me a damage assessment was
25   done within the FBI to determine the extent to which
```

NBF3GIRM

1    McGonigal's investigations were tainted.  So to the extent such

2    an assessment was done in this case, we certainly feel we would

3    be entitled to that under *Brady* and *Giglio*.  That would be a

4    starting point.  We understand that McGonigal, based on the

5    government's representations, led a briefing to the NYPD

6    leadership.

7            THE COURT:  I missed the word.

8            MR. ARTHUS:  Led a briefing to the NYPD leadership.

9    We would be entitled to any written records of that briefing as

10   well.  Government said he facilitated I believe the

11   communication of information between the FBI and the NYPD.

12           It may be they've given everything they have on that

13   to us.  If they have, then they've met their obligations.  But

14   if there is more out there detailing McGonigal's involvement,

15   then we would certainly be entitled to that.  But certainly a

16   damage assessment that was conducted within the FBI related to

17   this investigation we would be entitled to under *Brady*, and a

18   lot of the information that we have received about McGonigal is

19   heavily redacted.  To the extent that the government -- that

20   the Court can review that in camera, we're fine with that.

21           THE COURT:  Without getting into classified

22   information, I think it's safe -- Mr. McGonigal -- I didn't see

23   a lot of stuff with his name on it.  I'll just leave it at

24   that.  But okay.  Perhaps the in camera review is the best way

25   to do it, so I can see what else would need to be disclosed.

NBF3GIRM

1          You then pivot to other surveillance methods and other

2     bases on which you believe you are entitled to information.

3     I'm not sure about -- and I don't mean this -- I am not saying

4     I disagree with it.  I don't understand it.  FISA seems to give

5     the government a lot of leeway to do electronic surveillance,

6     to do physical searches, to do things of that nature.  And you

7     are even saying to me that you've received an awful lot of

8     materials.

9          Is your argument to me that you've got so much

10    information that this couldn't all have come from FISA and it

11    might have come from something else?

12          MR. ARTHUS:  Yes.  So not that it must have.  It

13    certainly tracks with the type of information that we would

14    expect to be generated from Executive Order 12333.  Certainly

15    from FISA 702 as well.

16          THE COURT:  I thought I understood -- am I making this

17    up?  I thought I understood that 12333 can't be used against

18    U.S. citizens after 2008.  Is that not correct?

19          MR. ARTHUS:  This would involve, this involves --

20    correct.  Yes.  This involves, though, individuals that -- and

21    this points also to the other two that we cited as well.  It

22    seems that at least some of the surveillance was conducted

23    either when Mr. Girgis was overseas or with individuals who

24    were overseas.

25          So, to the extent that those three surveillance

NBF3GIRM

1    methods capture individuals who are overseas or surveillance

2    that happens overseas, it would be implicated in this case.

3    And incidental as well, incidental collection of those sorts of

4    surveillance.

5        THE COURT:  You're making your challenges under Rule

6    41; you're making your challenges under FISA.  I don't know

7    whether the government would represent that information came

8    from other sources.  But I guess I appreciate that's the

9    argument, you need to know if there is another place for you to

10   make a challenge.  It would seem odd to me, though, if the

11   government says here's materials that we got and we got them

12   through FISA, for you to then say, well, maybe you got them

13   from other places as well.  So okay.  I guess I understand the

14   argument, and the government will tell me what it thinks it can

15   tell me about this.

16       I'd like you please to engage with the government's

17   argument that Section 3504 of Title 18 of the United States

18   Code is a catchall, but it's really for stuff that isn't

19   covered by other statutes.  It seems to me you are making the

20   arguments you're now making through FISA.  There are provisions

21   of the statute that permit you to do that.  You are making the

22   arguments under Rule 41.  There are federal rules that permit

23   you to do that.

24       I'm not sure what the purpose or utility of 3504 is.

25   Except to the extent you're concerned that the government may

NBF3GIRM

1   come back and say gotcha because there's some bucket of

2   materials that isn't subsumed by these other statutes.

3           MR. ARTHUS:  That is the concern, is that there may be

4   material in there that we don't know is suppressible because we

5   don't know the techniques that were used to obtain it.  It is

6   possible that a suppression motion could be granted to all the

7   FISA material, all the Rule 41 material, and there would still

8   be evidence that was admissible at trial that was obtained

9   through other means that we had no idea we had a mechanism to

10  suppress, because we didn't know that the actual surveillance

11  techniques listed were used at all.

12          THE COURT:  I understand that better.  Thank you.

13          This may be the last topic and then I'll perhaps let

14  you sit for a little while and be equally as questioning of the

15  government.

16          I understand but I'm not sure I accept the recruiting,

17  cultivating, grooming argument.  The tension for me in that is

18  that you seem to be -- and this is perhaps a broader point.

19  You seem to be acknowledging that the conduct that happened

20  that is discussed or that is evidenced in the materials or that

21  is discussed in the government's charging instruments or their

22  public statements, that that conduct happened.  There was a

23  meeting in Egypt, was there not, with law enforcement officers?

24  There was, yes?

25          MR. ARTHUS:  That is what the discovery materials

NBF3GIRM

1    would point to, yes.

2              THE COURT:  I appreciate the precision of your

3    response.

4              MR. ARTHUS:  Thank you.

5              THE COURT:  The discovery materials would appear to

6    reflect that certain communications took place.

7              MR. ARTHUS:  Yes.

8              THE COURT:  And that certain communications or certain

9    meetings took place.

10             MR. ARTHUS:  Yes.

11             THE COURT:  And so I understood your argument, your

12   defense to be, not that these things didn't happen, but that

13   they happened without the requisite intent.  That your client

14   was duped in some way.  Am I correct?

15             MR. ARTHUS:  Yes.

16             THE COURT:  Okay.  I almost feel you're grasping at

17   straws because there are people whose names appear repeatedly

18   in the government's discovery, there might have been some

19   concerted effort to cultivate expatriates and to get them to

20   become unregistered agents of the Egyptian government.

21             What is your evidence -- I feel as though, before I am

22   going to turn over that information, which I'm not even sure

23   exists, I feel there needs to be some threshold showing.

24             MR. ARTHUS:  I'll make two points.  First, there is a

25   reference in the discovery, I believe it comes from Flanagan,

NBF3GIRM

1    it is in the FBI reports, that individuals were concerned that

2    Mr. -- not concerned, but thought it was possible that

3    Mr. Girgis was acting as an unwitting agent.  That seems to be

4    pointed at.  So that's number one.

5            THE COURT:  On the one hand, you are telling me

6    Flanagan is not to be believed.  On the other hand, where it

7    helps you out, you're like, let's believe Flanagan.

8            MR. ARTHUS:  Yes.

9            THE COURT:  That's the argument you are making?

10           MR. ARTHUS:  That fact wasn't in the warrants either.

11   Aside even from that, though, this is another circumstance

12   where, because we want to make sure we are not trying to

13   capture sources and methods and, if the information is not

14   there, it's not there. if the Court wants to review that in

15   camera, and if there is nothing there, there is nothing to

16   disclose.  But if that information is there and does exist,

17   then it certainly bolsters our defense and we would be entitled

18   to it.

19           THE COURT:  Here's my one concern.  I don't mind in

20   camera review and that's fine.  Mr. Dalack will recall from

21   another case that we have that I have this curious situation

22   where sometimes I can review material, and I can't tell you

23   whether the thing exists or doesn't exist.  I can simply tell

24   you that there is nothing for me to disclose to you.  It is a

25   very unfulfilling or unhelpful response.  But it is by law the

NBF3GIRM

1    only response I can give.

2              So, I appreciate what you are saying, and I would like

3    to engage the government on the issue.  But I am just wondering

4    what actually I can say.  So I appreciate that.

5              Sir, those were the questions I had for you, and I

6    really, however mean I may have sounded, I really do appreciate

7    your preparedness and your attention to detail, because it's

8    obvious you have reviewed with great care all of the materials

9    that have been produced, and I'm grateful for that.

10             Is there anything that you wanted to make sure I

11   understood that I haven't questioned you about?

12             MR. ARTHUS:  I think we covered it.  Thank you.

13             THE COURT:  All right.  Ms. Kushner, you are up.

14   Where shall we begin.

15             Why don't we begin with the -- I don't think your

16   adversaries disagree that the law is what the law is.  That it

17   is very rarely the case that FISA materials -- in fact, it's

18   never been the case that FISA materials have been disclosed to

19   a litigant.  But that here, there are these two issues that we

20   don't have in another cases that I've reviewed.

21             I'd like you to engage on the Rule 41 issue versus the

22   FISA issue.  But I'd also like you to engage on whether we've

23   now hit the matrix of facts that actually requires disclosure

24   as a matter of due process.

25             MS. KUSHNER:  Sure, your Honor.  I don't think we are

NBF3GIRM

1    anywhere even close to that world.

2                So, with respect to the *Franks* issue, either in the

3    Rule 41 or in the FISA context, the defendant would have to

4    make a substantial showing that the affiant in this case with

5    respect to the Rule 41 affidavit, Connors, deliberately or

6    recklessly made and included false statements in an

7    application, or failed to include material information.

8                And even if the defense could show one of those

9    things, which it has not, it would also have to show that the

10   resulting misrepresentation or omission was necessary to the

11   probable cause finding.  So even if you had eliminated the

12   situation where a material misstatement made had eliminated

13   that from the affidavit but still could find probable cause.

14   Or in the case where information was omitted, had you included

15   that information in the affidavit, was that the reason that

16   probable cause was or was not found, and there is nothing here

17   that would rise to that standard.

18                The only alleged omission here is that Flanagan's

19   criminal history was not included in the Rule 41 affidavit.

20   But even that itself was not necessary, and would not have

21   undermined the probable cause finding.

22                The Rule 41 affidavit, to the extent it relies on

23   Flanagan, is based on recorded conversations, written

24   communications, all of which has been produced to the defense.

25   So this was not Agent Connors relying on the mere

NBF3GIRM

uncorroborated statements of Flanagan.  And secondly, Flanagan

is not the primary or the chief source of the government's

information in the Rule 41 affidavit.

        And I think we lay out all the instances, all the

facts that are not tied to Flanagan at all in our brief on

pages 13 to 15.  So, probable cause is not dependent on the

fact that Flanagan had a criminal history.

        THE COURT:  Let me ask this.  Let's imagine that I

defer on the FISA issue pending the resolution of the *Franks*

motion on the Rule 41 affidavit.  If I were to find that *Franks*

has been violated, that this was in fact material and it was

necessary to a finding of probable cause, is that enough to

give them entree into the FISA serials?

        MS. KUSHNER:  Absolutely not, your Honor, but for

reasons that I would not talk about right now.

        THE COURT:  Okay.  That I do understand.  But, I guess

what I am saying is, is there a world in which I could defer a

question of disclosure until after the *Franks* hearing on the

Rule 41 application?  You may tell me no.  I am just asking

whether I need to see the *Franks* application on the Rule 41

warrant and make the determination there before I decide what

to do with the FISA materials.

        MS. KUSHNER:  No, your Honor.  There won't be any

reason why the former would -- the latter would turn on the

former.  Again, for reasons I'm happy to talk about in a

NBF3GIRM

1   Section 2.

2          THE COURT:  It was not as clear to me before oral

3   argument why the defense is challenging the issue of

4   minimization.  And it is interesting, because you would think

5   that the defense would want as much information as possible

6   about their client, and they would be happy with this surfeit

7   of information that's been produced.  But in fact what they are

8   saying is there is so much that there must have been a problem

9   with minimization.

10         What do you believe my role is on the issue of

11  minimization?  What deference, if any, am I to give what I know

12  to be the filings on minimization in this case?

13         MS. KUSHNER:  Your Honor, I think there is a lot of

14  deference that the Court should give here.

15         So, again, in this context, once you find that any

16  FISA information was lawfully acquired, and then have to

17  consider whether it was also lawfully conducted, in considering

18  that, the question really is whether good faith efforts to

19  minimize were attended to, is that what the government did in

20  this case.  And the mere fact that a significant amount of

21  discovery has been produced in this case, in no way goes to the

22  government's good faith effort to apply minimization standards

23  here.

24         As the Court is aware, there is wide latitude given to

25  the government in applying in good faith those minimization

NBF3GIRM

1    standards, including, for example, where, in this case, where

2    there's alleged clandestine activities and things, the

3    government cannot know necessarily off the bat whether some

4    language is code for something else or whether certain contacts

5    Girgis may have had is relevant.

6            So there is wide latitude given, especially in these

7    situations, where we're talking about for shorthand spying or

8    using someone as an agent of a foreign government, that the

9    government has to kind of take a fair and not overly narrow

10   approach in reviewing information.  And so that may include --

11   that may mean not every wholly innocent conversation gets

12   minimized, but that's not the standard here, and that's not the

13   issue that the Court has to be deciding.

14           The Court simply has to look at whether a good faith

15   effort was made, and the Court can and should make that in an

16   ex parte proceeding here.

17           And I'll also add that our decision to turn over

18   discovery material has nothing to do with whether it was

19   minimized or whether it came from something that minimization

20   procedures would have even been applied to.

21           THE COURT:  I'm not sure I understood your last

22   comment.  Are you suggesting to me that you may have obtained

23   this material from sources other than the FISA warrants?

24           MS. KUSHNER:  The discovery certainly includes

25   non-FISA derived information.

NBF3GIRM

```
 1              THE COURT:  Fair enough.  And now you're leading into
 2     the issue that your adversary raised.  They've got so much
 3     information that they are assuming it came from sources other
 4     than FISA and the search warrant.
 5              Are you prepared to comment on or to eschew the
 6     involvement of Exec Order 12333 or other sources?  I appreciate
 7     that normally when discovery is produced, you don't say this
 8     came from this, this came from this, although there are some
 9     instances in which it's obvious that materials came from a
10     device order, because you see it is some coming from the
11     device.
12              The government in its opposition suggested that it was
13     unwilling to disclose every bit of investigative work it had
14     done in this case.  But to the extent the work that it did
15     implicated the statutes or these provisions for which there
16     might be themselves a basis for suppression, will the
17     government acknowledge use of those particular avenues?
18              MS. KUSHNER:  Your Honor, to date the government has
19     complied with its notice obligations, whether under FISA or
20     elsewhere.  If there is any other obligation that the
21     government has that it has not done so to date or that it
22     learns about for some reason, then it would make additional --
23     it would give additional notice.  But right now there is no
24     basis to believe the government hasn't complied with its notice
25     obligations.  And if there is any investigative techniques --
```

NBF3GIRM

1    and I'm not aware there are, I'm not saying there are one way

2    or the other -- if there something that would have to be

3    brought to the Court's attention in a classified setting, the

4    government would do that.

5         But again, as far as FISA and general notice

6    provisions are concerned, the government has complied with its

7    obligations.

8         THE COURT:  Let me probe a little bit more what your

9    adversary was saying, which is they don't want to be in the

10   situation where there is a suppression argument that they

11   failed to raise because they didn't know you used a particular

12   investigative technique in any case that would permit them to

13   make such an argument.  And I appreciate that.

14        So I'd like you to focus on that, but I'd also like

15   you to focus on the fact that they themselves are using this

16   catchall provision "just in case."  Right?  Just in case

17   there's another basis for suppression that they don't want to

18   lose.  They don't want to be in a situation where they've left

19   something on the table, and I appreciate that.

20        So how do you give them or me comfort that, to the

21   extent that some other investigative technique might implicate

22   a challenge, a suppression motion, was used, that they are

23   aware of it?

24        MS. KUSHNER:  So, again, to date the government has

25   complied with its disclosure obligations, including providing

NBF3GIRM

```
1   any information that the defense would need to make a motion to

2   suppress.  If there is some classified investigative technique

3   implicated in the government's case at all, then the government

4   believes that would be appropriately addressed in a Section 4

5   setting.

6            THE COURT:  I figured I would hear that at some point

7   today and now I have, thank you.  Should I be expecting at some

8   point a Section 4 application?

9            MS. KUSHNER:  There is no schedule set, but, your

10  Honor, should the case proceed to a certain stage, then yes.

11           THE COURT:  Okay.  I appreciate the subtlety of that,

12  thank you.

13           Could you help me a little bit more with 3504.  I

14  presume you're telling me that 3504 doesn't apply because it is

15  a general broader statute, and there are specific statutes of

16  which the defense is aware, and indeed, which they're invoking

17  in this case.  Is there another reason why I should not be

18  focused on Section 3504?

19           MS. KUSHNER:  No, your Honor.  Again, 3504 is not the

20  governing notice provision with respect to FISA.  The

21  government has given the notice pursuant to FISA and based

22  on -- there is no other basis for the government to provide

23  notice of anything under 3504.

24           THE COURT:  I'll ask you the same questions I've asked

25  the defense.  Have you seen a case in which a court, a federal
```

NBF3GIRM

```
 1    court, has required disclosure even in order to aid it in

 2    making a determination about the legality of the FISA

 3    application or because of a different or related due process

 4    concern?

 5           MS. KUSHNER:  I have not, your Honor.

 6           THE COURT:  I share Judge Rovner's concern in *Daoud*

 7    that there's something unfortunate about not allowing the

 8    defense the materials that it needs -- they don't even know

 9    whether they have a *Franks* application to be made with respect

10    to the FISA warrants.  And there is a degree, and it may be

11    enshrined by law and nothing you can do.  But there is a degree

12    in which they're relying on me to vindicate their rights.

13           I am concerned, and I'm concerned given the arguments

14    that are being made, that there were errors or omissions to the

15    FISA court that may have yielded bases for surveillance,

16    searches whatever.

17           So, it may be that ultimately you are going to tell me

18    that's just the way the law is, but please understand my

19    frustration with that.  So if there is something else you could

20    tell me, I would appreciate that.

21           MS. KUSHNER:  Of course, your Honor.  This FISA

22    setting is unusual to all of us in that there is strict

23    procedures for ex parte proceedings and not allowing the

24    adversary to see discovery, but for very important reasons, and

25    as is reflected in the case law and the legislative history of
```

NBF3GIRM

1    the statute, this was top of mind for Congress in deciding how

2    to balance national security concerns with an individual's

3    rights.  So the ex parte procedures that FISA has laid out is

4    reflective of that balance.

5        And in this case, where the legality of any FISA

6    materials the government believes would be something that the

7    Court could readily determine on its face.  That means that

8    FISA, the procedures that are afforded by FISA are working

9    appropriately.

10        If for some reason the Court believed, even though I'm

11    looking at all these materials I cannot determine the legality

12    of it, that is when an avenue would open to provide for an

13    adversarial proceeding.  But that is not the world in which we

14    are living.

15        So I think in this case the Court is very well

16    situated to assure itself one way or the other whether there

17    was any material misstatement, and it would not require

18    defense's input in making that determination.

19        THE COURT:  I want to agree with you and I want to

20    believe that I am capable of doing that.  But something that

21    your adversary was raising a little bit earlier in the

22    discussion was that there is some significance to the quantum

23    of discovery produced, and I'm not sure I am going to be able

24    to articulate this properly but I am going to try and do this

25    nonetheless.

NBF3GIRM

```
 1          I have the ability to look at a FISA warrant
 2   application and to see what is contained in it.  And there are
 3   certain things that I imagine it would be easy for me to
 4   determine, such as whether someone is a foreign agent or not a
 5   foreign agent, or whether there are certain items that are tied
 6   to someone who is either a foreign government or an agent of a
 7   foreign government.  So that I understand.
 8          But what they are saying here is something different,
 9   which is this isn't really -- the production of materials that
10   they have received is something I actually don't have.  And to
11   the extent -- and I'm not asking for it, by the way.  But to
12   the extent that the production of FISA discovery informs my
13   analysis of the minimization or something else, I just don't
14   have those materials.  And so let me try that again with a
15   little more coherence.
16          I have a full drawer, almost a full drawer of
17   materials from you all that I have reviewed.  And that can help
18   me understand whether there were, for example, and speaking
19   hypothetically, whether there were the appropriate
20   certifications.  Whether there was an articulation of probable
21   cause.  So that I get.  I know that there are procedures for
22   minimization.
23          What your adversary is saying is that they will tell
24   you that the sheer amount of material they've received in
25   discovery suggests that the minimization procedures weren't
```

NBF3GIRM

```
1   working.  That's not something I have, so how do I evaluate
2   their minimization arguments with the materials I do have and
3   not the materials that I don't have?
4            Do you understand what I've just asked?
5            MS. KUSHNER:  You are saying you don't have access to
6   all the discovery materials that we've produced.
7            THE COURT:  Exactly.  What I'm saying is I don't know,
8   and maybe the answer is I need to speak to the government
9   pursuant to Section 2.  What I am saying is there are things I
10  can do with the materials that I have been given.  And I think
11  that I have the ability at least to determine whether I can or
12  cannot opine on the propriety of the certification.  Whether I
13  can opine on the propriety of the probable cause.
14           On the issue of the minimization procedures, I'm
15  wondering if I have enough materials, because what I have would
16  be sort of the exhortatory or the directives to agents, do
17  this, don't do this.
18           But what they're saying to me is the sheer amount of
19  materials that they've received suggest that somewhere along
20  the line those directives weren't followed.  That's what I'm
21  asking.
22           MS. KUSHNER:  Sure, your Honor.  And I do believe the
23  Court has everything it needs to determine whether the
24  government applied good faith, acted in good faith in applying
25  the minimization procedures.  And I don't think that the volume
```

NBF3GIRM

1    of discovery, for a variety of reasons, has any relationship or

2    reflection on the propriety of the minimization standards

3    applied.  So the fact that they have a lot of discovery has no

4    bearing on the good faith analysis here.

5            THE COURT:  Are you also invoking *Leon* good faith on

6    any other aspect of the FISA applications?  For example, it may

7    be that you are not going to articulate anything here for

8    various reasons, and it may be that you are not going to

9    respond until, for example, there is a challenge that goes

10    beyond we might benefit from seeing these materials to see if

11    there is a complaint to be made about the certification or the

12    probable cause procedures.

13            But I guess I am just asking, if they got to that

14    point and said, for example, probable cause wasn't adequately

15    articulated in the FISA materials.  I suppose then they'd have

16    to see the FISA materials, so let me withdraw that whole line.

17            I was trying to figure out whether you were using *Leon*

18    for anything other than minimization.  And I guess the answer

19    is you don't know until you know what their arguments are.  It

20    could be the backstop for another suppression argument they're

21    making.

22            MS. KUSHNER:  Of course, your Honor.  At this time,

23    the good faith, the *Leon* good faith standard I am just talking

24    about in the minimization context.

25            THE COURT:  Appreciate it.  Thank you.

NBF3GIRM

1              The interesting thing about there being no cases doing

2     what the defense is asking me to do is that at some point there

3     will be a case where the facts and circumstances are such that

4     allowing the defense access to FISA materials is appropriate.

5     I know you said to me earlier that we haven't reached that yet.

6     But, from the defense's perspective, you have a challenge both

7     to the disclosure and the propriety of disclosures made to the

8     FISA court, but also to the integrity of the entire

9     investigative team.  And I guess I'd like you to discuss with

10    me again, why, even with those challenges, they don't get

11    access to the FISA materials.

12              MS. KUSHNER:  Your Honor, again, because we haven't

13    reached it, we're not even close to reaching that world.  And I

14    can go into the *Franks* related issue in a Section 2 proceeding.

15    And with respect to any -- I think their primary concern about

16    the integrity of the case relates to McGonigal.  To the extent

17    the government can disclose information about his role to the

18    defense, it has done so.

19              THE COURT:  Can you tell me more than you've told

20    them?

21              MS. KUSHNER:  Yes, your Honor.

22              THE COURT:  Okay.  I thought I understood, and perhaps

23    I didn't understand from the defense team that they might

24    accept a Section 2 -- I'm just saying what I remember from your

25    response is that there are discussions, but at a very generic

NBF3GIRM

1    level.  He did this thing.  He may have -- the word "approved"

2    is in there somewhere.  The world "facilitated" is probably in

3    there somewhere.

4            But if I'm allowed to know exactly his involvement in

5    the FISA applications, then I suppose that I might feel more

6    comfortable in looking at that and seeing if there is

7    additional material.  Though I said to the defense I wasn't

8    buying the argument that the disclosure raised more questions

9    than it answered, I do want to be sure I understand the

10   totality of his involvement, because he was in a pretty

11   significant position at the FBI when this was going on.  So,

12   all right.  I will leave open the possibility.

13           MS. KUSHNER:  Just to be clear, your Honor, the

14   additional information has been disclosed to the Court, but

15   it's in the government's classified brief.

16           THE COURT:  I understand.  I'm not sure I was

17   satisfied with that.  Let me say that.  It doesn't mean I won't

18   be, but okay.  Because I remember leaving that thinking there

19   might still be more.  I will look at that and I will get back

20   to you as appropriate.  Thank you.

21           Could you then please discuss the last argument that I

22   was addressing with the defense team which is this grooming

23   argument.  And let me, before you do so, I want to make sure

24   that I understand it complete -- ah, here, too, I'm told that

25   they're willing to accept my in camera review.

NBF3GIRM

1          What can you tell us?  What can you tell us?  If there

2    were a concerted effort, would you disclose it?

3          MS. KUSHNER:  A concerted effort by others to --

4          THE COURT:  By Egyptian nationals to recruit Egyptian

5    expatriates for whatever, and basically turn them into

6    unwitting foreign agents.

7          MS. KUSHNER:  Your Honor, the government has disclosed

8    all -- withdrawn.

9          The government has disclosed the relationship and the

10   efforts to task Girgis by these government officials.  Whether

11   these or other intelligence officers ever tried to speak with

12   or recruit someone else ever is not discoverable or relevant in

13   this case, and would really I think, for lack of a better term,

14   I mean, I think it would get so far afield from what the issue

15   is here, and would be unmanageable.  There is no way for the

16   government to determine ever what, if any, efforts were made by

17   other people to recruit others.

18         The case here is about whether Girgis himself knew

19   that he was working with and acting for a foreign agent,

20   including by cultivating and developing and carrying out tasks

21   for these nine Egyptian officials.  And all of those efforts,

22   to the extent they're not classified, have been disclosed to

23   the defense.  And the fact that I think they mentioned that

24   Flanagan made some suggestion that Girgis was an unwitting

25   source.  Statements like that that pertain to Girgis, that has

NBF3GIRM

1    been disclosed to the defense.  So if there was any sort of

2    *Brady* in that area or any arguments to be made that Girgis

3    himself was an unwitting source, that discovery has been

4    provided to the defense.

5        But whether someone ever tried to recruit somebody

6    else and that may or may not have been successful is not

7    relevant to whatever what happened here with respect to Girgis.

8        THE COURT:  I'm agreeing with you in part to the

9    extent that in the course of -- that some representative of a

10    foreign country could try to recruit someone as an agent, and

11    succeed or fail, that that would not necessarily be

12    illuminative of the issue of whether Mr. Girgis was acting with

13    the appropriate intent.  I get that.

14        I guess what I'm saying is if your investigation

15    disclosed -- and I'm kind of making this up for purposes of

16    this discussion -- but if your investigation disclosed that

17    there was in fact a handbook at the Egyptian consulate that

18    says we have a plan, we are going to go out there and find as

19    many expatriates as we can, and here's a way in which we can

20    reach out to them and see if ultimately they would be useful

21    for us and provide information for us.

22        If there was such a formal proceeding, would that not

23    be relevant?

24        MS. KUSHNER:  Your Honor, it would not be relevant.

25    Again, the question here is whether Girgis himself was

NBF3GIRM

1   knowingly acting as an agent of a foreign government, and if

2   there was information that showed that he did not know, for

3   example, that someone he was working with was a member of the

4   government or that something he was doing was not for the

5   benefit of Egypt and was just out of the kindness of his heart

6   to organize some law enforcement trip, that kind of discovery

7   would -- that would be discoverable and that would be produced.

8   But, anything that is outside of that scope or general efforts

9   by Egyptian foreign officials to try to recruit others, that is

10  not relevant here.

11          What is relevant here is whether Girgis knew that he

12  was working for and at the direction of Egyptian officials.

13  And as we laid out in our brief, and obviously would prove if

14  and when there were a trial, is that there is overwhelming

15  evidence that he knew that the people he was working with were

16  officials for the Egyptian government, and in fact specifically

17  for an agency that is involved in the types of activities that

18  Girgis was helping them with.

19          THE COURT:  Again, I appreciate the precision of your

20  answer.  Thank you.  Please give me a moment.  Thank you.

21          Mr. Arthus, do you want to say anything in reply, sir?

22          MR. ARTHUS:  I'll keep it brief.

23          THE COURT:  You don't have to keep it brief.  I'm not

24  sure I have questions, but I would appreciate your reactions to

25  what you've just heard.

NBF3GIRM

1        MR. ARTHUS:  I'll start with the last point, which in

2   the Court's hypothetical of a handbook, that would be

3   incredibly relevant to the mens rea issue.  If the issue was

4   whether or not Mr. Girgis knew that he was acting as a foreign

5   agent, the existence of a coordinated plan by Egyptians to

6   recruit people who would unknowingly act as their agents goes

7   directly to the mens rea.  That would be critical information.

8        THE COURT:  Only if the handbook said let's recruit

9   them and let's make sure they don't know.  If the handbook says

10  let's recruit them and make sure they know --

11       MR. ARTHUS:  A scheme to recruit unwitting agents,

12  that would be incredibly relevant and material to a defense.

13       There was one thing I neglected to mention earlier but

14  I wanted to raise about the other surveillance potential

15  methods and the relevance to the case.  It also is relevant to

16  the FISA litigation itself.  Because to the extent anything was

17  captured by those other surveillance methods and then cited in

18  the FISA warrant materials, that would give rise to a fruit of

19  the poisonous tree argument.  So it is relevant in that context

20  as well.

21       THE COURT:  Can I ask you to pause for a moment so I

22  can write that down.  Thank you.

23       MR. ARTHUS:  Sure.

24       As a final point of the minimization issue.  I think

25  the Court hit the nail on the head with the question about the

NBF3GIRM

1    discovery and scope of it and the amount.  That's precisely why

2    adversarial litigation is needed in this kind of circumstance.

3    We've been reviewing this voluminous discovery for months and

4    months and months now, and the Court's seen on the docket the

5    adjournments that have been taken while we've been reviewing

6    this discovery.  This is precisely the kind of situation where

7    the Court would benefit from our consideration in order to make

8    the determination on minimization.  FISA doesn't -- it doesn't

9    mandate, and the Court's aware of this, but it doesn't mandate

10    cutting us out of the process.

11                THE COURT:  It doesn't what?

12                MR. ARTHUS:  It doesn't mandate cutting us out of the

13    process.  If our input is valuable to the Court in making an

14    accurate determination of the legality, if it is necessary for

15    due process, then we are entitled to be included.  And that's

16    the Court's determination to make.  But our position is that

17    both of those prongs are met, so we should get access to the

18    FISA materials on that basis.

19                THE COURT:  Anything else, sir?

20                MR. ARTHUS:  No, thank you.

21                THE COURT:  If you both all just give me a moment, I

22    want to make sure there isn't an unanswered question for me.

23                Mr. Wirshba, something else to add?

24                MR. WIRSHBA:  Sure, your Honor.  Your Honor, with

25    respect to your specific example of the handbook, I will say

1    that --

2                THE COURT:  Which, by the way, I'm making up, to be

3    clear.

4                MR. WIRSHBA:  Right.  And to be clear, the government

5    is not aware of such a handbook as I sit here today.  The

6    people at this table are not aware of such a handbook, and that

7    was obviously a hypothetical that your Honor came up with.

8                Of course if there were such a handbook that the

9    government was aware of within the prosecution team's

10   possession, the government would undertake an individualized

11   examination of whatever document or item it is to determine

12   whether or not there is a discovery obligation with respect to

13   that item, and either disclose it or bring it to the Court's

14   attention in a Section 4 proceeding.

15               What I will say, and I think is the focus of the

16   defense arguments, is that with respect to efforts by

17   intelligence agents of Egypt to recruit other people, that

18   discovery of those materials is too far afield, and I think

19   that that is really the focus of what the defense has raised

20   with the Court, and that is the focus of what the government is

21   saying is just absolutely not discoverable here.  So we --

22               THE COURT:  Why?

23               MR. WIRSHBA:  Because while the handbook is a very

24   specific example that might actually implicate Pierre Girgis,

25   the fact that they are attempting to recruit another person --

NBF3GIRM

1    not saying whether that actually happened or not -- but the

2    fact that they are attempting to recruit another person would

3    not have any bearing on Mr. Girgis's mens rea in this case,

4    which is the issue that will be relevant at trial.

5         And to require the government, even in an in camera

6    setting, to bring forth all the materials that might reflect

7    whether or not these intelligence officials were recruiting

8    others would be tremendously burdensome and outside of the

9    requirements of any disclosure obligation that the government

10   has.

11        THE COURT:  Thank you.

12        Mr. Arthus, you get the last word here.

13        MR. ARTHUS:  No response is needed.  Thanks.

14        THE COURT:  Thank you.  I don't think at the moment it

15   would be useful for me to now break out and have the classified

16   proceeding.  I think the better thing is for me to rereview

17   certain materials in light of what has been said today, and

18   I'll ask the government to please obtain a transcript of this

19   proceeding so that I can have that with me as I'm doing it.

20   And then I will get back to the government as appropriate if I

21   need to have anything shown to me or discussed with me in a

22   classified setting.  And otherwise I'll get back to you as soon

23   as I can.  All right.

24        Anything else to address today?

25        MS. KUSHNER:  Not from the government, your Honor.

NBF3GIRM

1          MR. ARTHUS:  No, thank you.

2          THE COURT:  I thank you all very much.  Much

3    appreciated for the argument.  We are adjourned.

4          (Adjourned)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25